IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA

PANAMA CITY DIVISION

| | |
|---|---|
| A.L., by P.L.B., and ) | |
| P.L.B. for herself ) | |
|     Plaintiffs ) | Case No. 5:12-cv-299 RS-EMT |
| **vs.** ) | |
| ) | |
| Jackson County School Board, ) | |
|     Defendant | |

PLAINTIFF'S RESPONSE TO
DEFENDANT JACKSON COUNTY SCHOOL BOARD'S MOTION FOR
SANCTIONS PURSUANT TO FEDERAL RULE 11

COMES NOW, Plaintiffs, by and through counsel, and responses as follows:

1. "If parents of a disabled child are not satisfied with a proposed IEP or "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," 20 U.S.C. § 1415(b)(6)(A), the IDEA provides parents a right to "an impartial due process hearing" before the state or local educational agency, id. § 1415(f)(1)(A). In the event of an adverse outcome at the hearing level, the parents may bring a civil action in federal district court or a state court of competent jurisdiction. Id. § 1415(i)(2)." *Phillip C. v. Jefferson Cnty. Bd. of Educ. No.* 11-14859, D.C. Docket No. 2:07-cv-00756-RRA(11th Cir., 2012 (AL))

2. The right to bring action in this court when parents are not satisfied with any matters listed is absolute. When Plaintiffs filed their due process request in April 2012

in this case, STUDENT had lost another eighteen months of educational opportunity. He was not mastering skills or academic content for classes he needs to graduate with a regular diploma; was coming up on a summer without any of the services recommended in his latest evaluation; and Jackson County School Board ("JCSB") had not just refused to do what the IDEA required, but also was retaliating by not giving accommodations so STUDENT could have audio texts and use his Livescribe Smart Pen so he could refer to what the teacher said about assignments and content, when he didn't remember.  JCSB was not even allowing MOTHER to have IEP meetings — this over JCSB's decision after MOTHER complained about a staff member, denying her permission to record that she originally needed because STUDENT's other parents wanted to be able to participate but could not attend the meetings, and then needed to get help increasing her effectiveness in advocating, and because the stress of her interaction with the school district was affecting her health and memory; and ultimately because she needed to record to have the tools to effectively petition the school board, and and ALJ or court for redress.   And  JCSB was not proposing any IEP's without MOTHER's participation either.   MOTHER saw no way to rescue the summer services and last two years before STUDENT would need the missing skills to successfully transition to college, other than to seek injunctive relief and redress for other claims in the same time frame.

3.     JCSB seems to have admitted that the stay put argument put forth to support this Rule 11 motion for sanctions was insufficient to support that Plaintiffs' Amended Complaint failed to state a claim: JCSB's 12(b)(6) motion [Dkt. 24]  did not raise that argument.

4. The ALJ's final order in the administrative due process hearing gives supporting caselaw for Plaintiffs seeking redress in this court. The ALJ wrote, "The First Circuit viewed the mandatory annual review of the IEP as an ongoing obligation of a school even while litigation is pending. The Court reiterated this principle when it stated that school districts cannot avoid their IDEA duties by not reviewing a child's IEP during "stay-put," as holding otherwise would reward school districts for "misfeasance or nonfeasance in providing appropriate education services" during a "stay-put" placement." [DOAH 12-1273E Final Order, p. 5] and "Thus, since the Division does not have injunctive authority, the only remedies for a stay-put Individual Education Program ("IEP"), which no longer meets the educational needs of the child, is for the parties to either agree to a change in placement or for one party to seek a preliminary injunction. *Wagner*, supra." [Id. 6-7] It is not unreasonable or frivolous to do precisely what the ALJ recommended be done.

5. Recently, the Ninth Circuit case also upheld a school district's obligation to update Individual Education Programs ("IEP") while litigation is pending. *Anchorage School District v. M.P.,* No. 10-36065, D.C. No. 3:09-cv-00189-TMB, 8338- (9th Cir. July 19, 2012) gives additional support to Plaintiff's effort to revise or overturn *CP v. Leon County School Board,* 483 F.3d 1151 (11th Cir., 2007) if the court were to find that *CP* is applicable to this case, despite the factual differences (see #6-7 below):

> [5] Here, it is beyond dispute that M.P.'s parents were zealous advocates for their son. Due to their ongoing concerns about the adequacy of the educational opportunities and services provided by the ASD, M.P.'s parents filed four administrative complaints in August and September

2008 and obtained a "stay put" order in connection with a then-pending administrative proceeding. Having reviewed the record, we are aware that this zealousness probably contributed to their strained relationship with the ASD. Yet it would be antithetical to the IDEA's purposes to penalize parents—and consequently children with disabilities—for exercising the very rights afforded to them under the IDEA. See 20 U.S.C. § 1400(d)(1)(B) (explaining that one of the IDEA's purposes is "to ensure that the rights of children with disabilities and parents of such children are protected").

[6] Therefore, when the ASD received M.P.'s parents' extensive revisions to the ASD's February 2008 draft IEP, the ASD had two options: (1) continue working with M.P.'s parents in order to develop a mutually acceptable IEP, or (2) unilaterally revise the IEP and then file an administrative complaint to obtain approval of the proposed IEP. ...But the ASD could not simply ignore its affirmative duty under the IDEA by postponing its obligation to revise the outdated IEP. Cf. N.B., 541 F.3d at 1209. Endorsing such an outcome would force M.P.'s parents to make a Hobson's choice: accept the ASD's proposed IEP despite its deficiencies or forego even modest improvements to M.P.'s educational program. Accordingly, we conclude that the ASD's "take it or leave it" approach contravened the purposes of the IDEA, which was enacted to ensure that all children with disabilities receive a FAPE, and that the rights of eligible children and their parents are protected. 20 U.S.C. §§ 1400(d)(1)(A)-(B).

[7] We acknowledge that the ASD's ability to revise the IEP was necessarily constrained by the "stay put" order, which required that the ASD maintain M.P.'s writing educational placement for the duration of the 2006-07 academic year. But the mere existence of the "stay put" order did not excuse the ASD from its responsibility to have a statutorily compliant IEP in place at the beginning of each school year. 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323(a). Indeed, to conclude otherwise would vitiate the purpose of the "stay put" provision, which was designed to "strip schools of the 'unilateral authority they had traditionally employed to exclude disabled students . . . from school' and to protect children from any retaliatory action by the agency." Johnson ex rel. Johnson v. Special Educ. Hearing Office, 287 F.3d 1176, 1181 (9th Cir. 2002) (quoting Honig v. Doe, 484 U.S. 305, 323 (1988)).   [8] The "stay put" order meant only that the ASD could not change M.P.'s "educational placement," which we have held "means the general educational program of the student." N.D. ex rel. Parents Acting as Guardians Ad Litem v. Haw. Dep't of Educ., 600 F.3d 1104, 1116 (9th Cir. 2010). We have explained that "a change in educational placement relates to whether the student is moved from one type of program—i.e., regular class—to another type—i.e., home instruction." Id. Or it may also occur "when there

>is a significant change in the student's program even if the student remains in the same setting." Id. For purposes of our discussion, it is not necessary to further define this term. We emphasize only that the ASD can satisfy its statutory obligations to review and revise M.P.'s IEP without effecting a change in his educational placement for writing instruction. Thus, we hold that updating an eligible student's present level of academic achievement and functional performance and establishing corresponding goals and objectives does not qualify as a change to a student's educational placement, so long as such revisions do not involve changes to the academic setting in which instruction is provided or constitute significant changes in the student's educational program.

6. Plaintiffs did not raise the stay put issue at all in this matter. Plaintiffs specifically did not claim stay put in its original due process request in April 2012 or in November 2010, except to avoid the proposed placement in a learning strategies class, re-imposition of an aide, and maintenance of the few accommodations that JCSB had agreed to. And Plaintiffs do not claim stay put in the Amended Complaint in this current case. It is the affirmative defense JCSB raised at the administrative due process level for why it has not complied with IDEA statute and regulations requiring updated annual IEPs. Plaintiffs cannot be responsible for attorney fees for the costs of JCSB's raising affirmative defenses. This is particularly true when JCSB is ignoring totally its continuing affirmative obligations under the IDEA (as well as Section 504).

7. And *CP v. Leon County School Bd. Florida*, 483 F.3d 1151 (11th Cir., 2007) was not a case in which parents sought injunctive relief, so one cannot definitively determine it applies to the same end in a case like the present one in which MOTHER did not claim stay put, and where Plaintiffs seek injunctive relief.

8. The Individuals with Disabilities Education Act does not lend itself to blanket decisions about appropriateness of educational services. IDEA claims have been denied class certification under Rule 23 because they require individualized fact finding and determination. *Miller v. Bd. of Ed. Albuquerque Public Schools*, 55 F.Supp.2d 1286, 1993-7, DNM 2006. Therefore by extension the applicability of the ruling in *CP v. Leon County School Board* in which the court found that parents had invoked stay put, to this case, where MOTHER explicitly did not, requires individual fact finding too. Seeking that in court cannot be considered frivolous.

9. In *T.R. v. St. Johns Co.Sch.District*, 50 IDELR 284, the Middle District of Florida denied a Rule 11 motion against the school district for seeking attorney fees in its answer, claiming the complaint was frivolous. The Middle District said that because IDEA has a clause shifting fees to a prevailing party, fees could be awarded under that clause, if appropriate, and the therefore the Rule 11 motion was denied, as JCSB's motion in this case should be. (Given that this court in the NDFL 5:12-294 case, stayed a motion for fees on the same grounds, for the same reasons, it is a puzzle why JCSB brought this Rule 11 Motion at all, just a few weeks later.)

10. This is consistent with the Advisory Comments to Rule 11: "...In cases brought under statutes providing for fees to be awarded to prevailing parties, the court should not employ cost-shifting under this rule in a manner that would be inconsistent with the standards that govern the statutory award of fees, such as stated in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)."

11.     "The reason that attorney's fees are awarded to successful plaintiffs as a matter of course where § 1988 applies is that in civil rights cases plaintiffs are "the chosen instrument of Congress." *Christiansburg*, 434 U.S. at 418, 98 S.Ct. at 699. Congress has decided to implement its civil rights laws by effectively deputizing individuals to act as "private attorney generals" while they pursue their own interests as plaintiffs. *Newman v. Piggie Park Enter., Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). Reimbursing successful plaintiffs for the cost of their attorneys out of the losing defendants' pockets serves a dual function: it provides an incentive for bringing the lawsuits, and it adds to the costs of those who violate the civil rights of others. Id.; *Christiansburg*, 434 U.S. at 418-19, 98 S.Ct. at 699.

12.     "By contrast, a victorious defendant in a civil rights action is not the "chosen instrument of Congress," few defendants need any incentive to defend themselves when sued, and a losing plaintiff in a civil rights case has not been found to have violated anyone's civil rights. Hence the rule announced in Christiansburg that defendants who win civil rights lawsuits generally cannot recover their attorney's fees from plaintiffs." *Young v. New Process Steel, LP*, 419 F.3d 1201, 1205 (11th Cir., 2005)

 13.    "**[9]**There is little case law governing the IDEA's provisions allowing school districts to recover attorney's fees.  We've previously noted that the language of the IDEA's fee-shifting statute is "nearly identical" to 42 U.S.C. § 1988, the general fee-shifting provision for federal civil rights cases. *See Aguirre* v. *L.A. Unified Sch. Dist.*, 461 F.3d 1114, 1117 (9th Cir. 2006). And the IDEA's language granting fees to prevailing defendants is nearly identical to the standard the Supreme Court developed in *Christiansburg Garment Co.* v. *EEOC*, 434 U.S. 412, 421-22 (1978), which is now the standard for awarding fees to prevailing defendants in civil rights cases. *See Hughes* v. *Rowe*, 449 U.S. 5, 14 (1980) (per curiam). *Compare* 20 U.S.C. § 1415(i)(3)(B)(i)(II) (permitting award of fees if suit was "frivolous, unreasonable, or without foundation"),

*with Christiansburg*, 434 U.S. at 421 (permitting award of fees if suit was "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith").

**"[10]** The IDEA's legislative history confirms that Congress fashioned section 1415(i)(3)(B)(i)(II) after the *Christiansburg* standard. *See* 150 Cong. Rec. S5250, S5349 (daily ed. May 12, 2004) (statement of Sen. Gregg) ("The first part of the amendment comes from the U.S. Supreme Court case of [*Christiansburg*] . . . ."). The legislative history further reveals that section 1415(i)(3)(B)(i)(III) "comes from another well established Federal law: Federal Rule of Civil Procedure 11." *Id.*; *see* Fed. R. Civ. P. 11(b) (subjecting parties to sanction for filing pleadings with an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"). Thus, we rely on *Christiansburg* and Rule 11 cases to determine whether the district court abused its discretion in awarding attorney's fees to the school district against the parents and their lawyer." *RP ex rel. CP v. Prescott Unified School Dist.*, 631 F. 3d 1117, 1124 (9th Cir. 2011)(in holding that the district court did so abuse its discretion)


14.     "...[I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit."  *Christiansburg Garment Co v. Equal Employment Opportunity Commission*, 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)


15.     "The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees."  *Hughes v. Rowe*, 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980) "Allegations that, upon careful examination, prove legally insufficient to require a trial are not, for that reason alone, "groundless" or "without foundation" as required by *Christiansburg*."  Id. 15.


16.     "In determining whether a suit is frivolous, 'a district court must focus on whether the case is so lacking in arguable merit as to be groundless or without foundation rather

than whether the claim was ultimately successful.'" Id. at 1189 (quoting *Jones v. Texas Tech University*, 656 F.2d 1137, 1145 (5th Cir.1981) (holding that unless the district court finds all testimony to be "absolutely incredible, and pure fabrication," its finding of frivolity cannot be sustained))." *Bruce v. City of Gainesville, Ga.*, 177 F.3d 949, 952 (C.A.11 (Ga.), 1999)

17. "This Circuit, recognizing that determinations regarding frivolity are to be made on a case-by-case basis, has identified several factors to help inform that determination, among them: "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." *Sullivan v. School Board of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir.1985). As this Court noted in Sullivan, however, "[w]hile these general guidelines can be discerned from the case law, they are general guidelines only and not hard and fast rules. Determinations regarding frivolity are to be made on a case-by-case basis." *Sullivan*, 773 F.2d at 1189.  *Bruce v. City of Gainesville, Ga.*, 177 F.3d 949, 952-3 (C.A.11 (Ga.), 1999)

18.  *Cohen v. World Omni Fin. Corp*. (11th Cir., 2012)(not frivolous when 2 of 4 factors weighed against defendant, because he made a prima facie case) See also *Quintana  v. Jenne,* 414 F.3d 1306, 1309 (11th Cir. 2005) (holding that plaintiff's discrimination claim was not frivolous, despite her inability to rebut the defendant's legitimate reason for failing to promote her, because she had established a prima facie case).

19. "Simply because the district court granted the defendants' motion for summary judgment does not mean that the plaintiffs' action was frivolous."  *O'Neal v. DeKalb County, Ga.*, 850 F.2d 653, 658 (C.A.11 (Ga.), 1988)

20. "Another factor we consider in a § 1988 case is the attention given to the claim: a claim is not frivolous when it is "meritorious enough to receive careful attention and review." *Busby v. City of Orlando*, 931 F.2d 764, 787 (11th Cir. 1991).

21. Rule 11 Advisory Comments also state: "Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty. ... Moreover, partial reimbursement of fees may constitute a sufficient deterrent with respect to violations by persons having modest financial resources." Plaintiffs' counsel is of such modest means, and did do due diligence. (See attached affidavit.)

22. JCSB's Motion for Sanctions misleads the court as to the claims raised in Plaintiff's Amended Complaint, which include claims for injunctive relief seeking an appropriate IEP under IDEA going forward; declaratory relief under the First Amendment concerning recording; one count for denial of free and appropriate public education under IDEA; one count for discrimination under Section 504, because no matter what IDEA required or didn't, JCSB had a continuing obligation under Section 504 to meet STUDENT's needs as adequately as the needs of nondisabled students are met; and one count for retaliation under IDEA, and retaliation under Section 504.

23. JCSB's affirmative defense of "stay put" issue is and would not be dispositive on Plaintiffs' Section 504 retaliation and discrimination claims, or IDEA retaliation claims, or Plaintiffs claims under the First Amendment, all of which ARE claims made in Plaintiffs' Amended Complaint. It is not unfrequent that rulings find retaliation even when the underlying complaint is not upheld.

24. A brief history and overview of the civil rights laws under which claims are made in this case starts with the Civil Rights Act of 1964, which protected people of color from

discrimination. It wasn't until 1973, that a statute with identical word except that it applied to protect those with disabilities was passed, included among other language addressing work opportunity. (Protection under Title IX for women was passed in 1972.) This was based on the same notion that civil rights for blacks was founded on: that no person should be denied the opportunity to become what they dreamed to the full extent they were able to do so, certainly not because of a condition or label.

25.     The language of Section 504 is just a single paragraph:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

26.     "For the first time, the exclusion and segregation of people with disabilities was viewed as discrimination. Previously, it had been assumed that the problems faced by people with disabilities, such as unemployment and lack of education, were inevitable consequences of the physical or mental limitations imposed by the disability itself. Enactment of Section 504 evidenced Congress' recognition that the inferior social and economic status of people with disabilities was not a consequence of the disability itself, but instead was a result of societal barriers and prejudices. As with racial minorities and women, Congress recognized that legislation was necessary to eradicate discriminatory policies and practices." *The History of the ADA: A Movement Perspective*, Arlene Mayerson, 1992, DREDF, http://dredf.org/publications/ada_history.shtml

27. Section 504 regulations require public schools to provide free appropriate public education. But that term is defined specifically in Section 504, in a way that is different from the IDEA language: Section 504 requires that:

> (a) General. A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap. (b) Appropriate education. (1) For the purpose of this subpart, the provision of **an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met** and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36 [which are procedural and substantive requirements that schools prove they cannot educate students in the regular environment before placing them in more restrictive ones, among other things. C.F.R. 104.34 [**Emphasis added**]

28. After Section 504 was passed, it was followed by the Education for All Handicapped Children in 1975, which is the forerunner of IDEA. This was a spending statute, giving schools some funds to address a particular subset of needs in thirteen specifically named categories of disability. IDEA's definition of free appropriate public education is different from Section 504, in that it is less specific, requiring education that meets the state educational standards, without the Section 504 requirement of meeting students with disabilities needs as adequately as the needs of nondisabled students are met. But both require provision of special education, related services, and accommodations in the least restrictive environment.

29.     Because schools districts received some funding under IDEA, some have come to believe that they are only required to provide special education under IDEA.  But that is simply not the case.

30.     In 1990, the ADA was passed prohibiting the private sector, and non-federal grantees, from discriminating against those with disabilities, and making protection from discrimination on the basis of disability a civil right, in addition to a grant assurance requirement.  It includes language prohibiting retaliation[1], which courts have inferred under Section 504, and IDEA and other statutes.  (See S *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161 (11th Cir., 2003), *M.T.V. v. Dekalb County School Dist.*, 446 F.3d 1153 (11th Cir., 2006))

31.     The Supreme Court in *Smith v. Robinson*, 468 U.S. 992 (1984), determined that IDEA preempted claims under Section 504, describing IDEA as "a comprehensive

---

[1](a) Retaliation
No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.
(b) Interference, coercion, or intimidation
It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.
(c) Remedies and procedures
The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III, respectively.  42 USC § 12203

scheme set up by Congress to aid the states in complying with their Constitutional obligations to provide public education to children with disabilities."

32.     In response, Congress thereafter inserted into IDEA Section 1415(l) which re-establishes the right to bring claims under all of the statutes protecting students with disabilities.  It reads:

> (l) Rule of construction  Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C. 790 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter. 20 U.S.C. 1415(l)

And therefore, even if Plaintiffs were held to have violated Rule 11 or to owe JCSB fees under IDEA, and the court were to have ordered payment thereof, it could only be the amount attributed to that issue.

33.      Granting JCSB's motion would be premature. "The time when sanctions are to be imposed rests in the discretion of the trial judge. However, it is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation...."  *Baker v. Alderman*, 158 F.3d 516, 523 (C.A.11 (Fla.), 1998)

34.     In this case, the evidence is clear that JCSB's motion for Rule 11 Sanctions must be denied.  It is not untimely to do that.

THEREFORE, Plaintiffs respectfully request that JCSB's Motion for Sanctions under Rule 11 be denied.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document has been filed electronically and furnished thereby by Notice of Electronic Filing this 23RD day of January 2013 to Matthew Fuqua, Bondurant and Fuqua, 4450 Lafayette Street, Marianna, FL, mfuqua@embarqmail.com., and Bob L.Harris, Messer, Caparello & Self, PO Box 15579, Tallahassee FL 32317, bharris@lawfla.com.

Respectfully Submitted this 23rd of January 2013.


/s/ Rosemary N. Palmer
Rosemary N. Palmer
FL Bar #70904
5260 Pimlico Drive
Tallahassee FL 32309
(850) 668-9203
ATTORNEY FOR PLAINTIFFS

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA

PANAMA CITY DIVISION

| | | |
|---|---|---|
| A.L., by P.L.B., and | ) | |
| P.L.B. for herself | ) | |
|     Plaintiffs | ) | Case No. 5:12-cv-299 RS-EMT |
| vs. | ) | |
| | ) | |
| Jackson County School Board, | ) | |
|     Defendant | | |

AFFIDAVIT OF COUNSEL FOR PLAINTIFFS ON DEFENDANT'S MOTION FOR RULE 11 SANCTIONS

Comes now, Rosemary N. Palmer, being more than eighteen years, and competent, and says:

1. I am the attorney of record for Plaintiffs in the above case.

2. Neither the Section 504 or First Amendment or IDEA claims in the above case were or are presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. To the contrary, I sent DEFENDANT a written offer of settlement at the same time filed the claims in this case at the administrative hearing in April 2012. Nine months later, having missed a summer of instruction he needed in 2012 and had another semester (Fall 2012) in which STUDENT had to drop a required class he did not have the skills to pass and could not get JCSB to provide accommodations in, STUDENT still needs what he is asking this court to order JCSB to provide him — the services recommended by the expert in Traumatic Brain Injury recommended in 2011, and accommodations.

Page 1 of 4

3. Each of the Section 504, First Amendment and IDEA claims are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

4. In preparing to file the complaint in this case, I spoke with other attorneys who handle civil rights and special education law claims, and/or who teach disability law, who uniformly said that the Eleventh Circuit's ruling in *CP v. Leon County School Board* is exactly backwards to the intent of the IDEA, to preserve a STUDENT's access to educational services, and the holding should be reverse.

They further noted that since school board can choose to change anything the parent agrees to change, and MOTHER did agree to the changes she requested, that a school board's continued refusal to do it because a parent was litigating could meet the elements of a retaliation claim; and its failure to update IEP's annually as the statute required, was an intentional denial of free appropriate public education.

They agreed that the facts were distinguishable in this case from *CP* anyway, as MOTHER in this case specifically did NOT claim stay put; and JCSB did change anything it wanted to change from the November 2010 supposed stayput IEP even without MOTHER's agreement (class assignments, the nature and amount and location of extended year services); and CP did not decide the issue in the context of an seeking an injunction to change the services going forward.

Page 2 of 4

And they also spoke of the required individual determinations that argue against wholesale application of findings in one IDEA case to others.

5. I also considered the Administrative Law Judge's Final Order which cited *Wagner v. Board of Education of Montgomery County*, 335 F.3d 297 (4th Cir. 2003): "Thus, since the Division does not have injunctive authority, the only remedies for a stay-put Individual Education Program ("IEP"), which no longer meets the educational needs of the child, is for the parties to either agree to a change in placement or for one party to seek a preliminary injunction. *Wagner*, supra." [Final Order p. 6-7]

6. Each of the the factual contentions in the complaint have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

7. I have been representing the Plaintiffs in matters against JCSB for several years. Plaintiffs are indigent and I have not received any attorney fees in the many hours I have spend on this and their other cases. I have outstanding invoices for costs that have not yet been paid. Most of my clients are indigent. And my average net legal income for the past five years is less than $25,000 per year. Any award of fees in this case would likely bankrupt me and perhaps make it impossible to practice law in the future.

8. Having practiced in this area for almost 20 years, and spoken with lots of parents and teachers and administrators who are very scared to challenge school boards and their supervisors even when they recite facts that appear to prove that laws are

Page 3 of 4

being broken, it is my professional opinion that an order awarding sanctions against me (or any attorney or parent) for appealing claims of parents brought under IDEA (and other statutes for which claims must be brought in IDEA administrative proceedings) to the U.S. District Court, as specifically allowed by federal statute, would effectively nullify all the parent protections granted under civil rights laws designed to assure that students with disabilities get a K-12 education that allows them to successfully transition to the post secondary outcome of choice.  Just like the ruling in *CP* has emboldened JCSB to refuse to update IEPs when the statute explicitly requires doing so annually, and the parents have requested it, Rule 11 sanctions will sentence even more students to a life far different from the one that is supposed to result when IDEA and Section 504 are honored.

Under penalties of perjury, I declare that I have read the foregoing affidavit and that the facts stated in it are true.

Executed this 23rd day of January 2013, pursuant to 92.525, Fla. Stat.

*[signature]*
Rosemary N. Palmer
FL Bar #70904
5260 Pimlico Drive
Tallahassee FL 32309
(850) 668-9203
ATTORNEY FOR PLAINTIFFS